
RD 10/30/19

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 30 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

MARTIN PORRETTI,

               Petitioner,

        - against -

YANIRA BAEZ,

               Respondent.

-------------------------------------------------------- x

**OPINION AND ORDER**

19 CV 1955 (RJD)

DEARIE, District Judge

     Petitioner Martin Porretti ("Petitioner" or "Porretti") petitions this Court for the return of his daughters, CP and RP,[1] to Mexico, pursuant to the Hague Convention on the Civil Aspect of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89 ("the Convention") and its implementing legislation, the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.* ("ICARA"). In December 2016, CP and RP's mother, Respondent Yanira Baez ("Respondent" or "Baez") removed the children from Mexico and brought them to the United States. Ms. Baez is a United States citizen who lived in New York for most of her childhood and young adult life. CP is now nine years old and RP is now fourteen years old; when they moved to the United States, they were six and eleven, respectively. For the reasons that follow, Mr. Porretti's Petition is denied.

## PROCEDURAL HISTORY

     Mr. Porretti filed the instant Petition on April 1, 2019 and the Court held a show cause hearing on May 14, 2019. The parties engaged in discovery, which primarily involved the production and translation of Mexican court documents related to the parties' divorce and

---

[1] Initials are used to protect the children's privacy.

custody proceedings. The Court conducted a bench trial on October 7 and 10, 2019. At trial, the Court heard testimony from Mr. Porretti, Ms. Baez, Ms. Baez's partner, Joseph Messing, and forensic examiner Dr. Peter Favaro. The Court also interviewed the children *in camera* outside the presence of counsel and the parties. The Court invited the parties to submit proposed questions for the children before the interview or propose supplemental questions after reviewing the transcript. The parties did not submit any questions for the Court. Finally, the Court received sworn affidavits from Sandy Phillips, the executive director of CP's afterschool program, Diana Perchekly, the mother of CP's best friend and Lauren Shookhoff, the assistant principal of RP's middle school. See Resp. Exs. LLLL, MMMM and NNNM.

## LEGAL STANDARD

The Hague Convention protects children internationally "from the harmful effects of their wrongful removal or retention" and establishes "procedures to ensure their prompt return to the States of their habitual residence." Hague Convention, pmbl.; Abbott v. Abbott, 560 U.S. 1, 32 n.6 (2010); Ermini v. Vittori, 758 F.3d 153, 160, 167-68 (2d Cir. 2014) (explaining that "the Convention...stresses the importance of deciding matters expeditiously" and noting "protraction is hardly consonant with the Convention's objectives," which "stresses the need for...establishing swiftly a degree of certainty and finality for children" (citing Chafin v. Chafin, 568 U.S. 165, 185 (2013) (Ginsburg, J., concurring))). A parent alleging breach of his or her custody rights under the Convention "may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 22 U.S.C. § 9003(b).

First, the Petitioner must establish a *prima facie* case of wrongful removal by a preponderance of the evidence. A removal is wrongful when "(1) the child was habitually

2

resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." Gitter v. Gitter, 396 F.3d 124, 130-31 (2d Cir. 2005) (citing Hague Convention, art. 3).

Second, once the Petitioner makes his *prima facie* case, the child must be repatriated unless the Respondent can successfully establish an affirmative defense. The Hague Convention contains four enumerated "narrow" affirmative defenses and a fifth unenumerated affirmative defense. It is in the Court's discretion to deny a petition if the Respondent establishes (1) the proceeding was commenced more than a year after the child's removal and the child has become settled in his or her new environment (the "well-settled" defense), Hague Convention art. 12, (2) the person seeking the child's return was not exercising his or her custody rights at the time of removal or retention, or he or she consented to—or subsequently acquiesced in—the child's removal or retention, Hague Convention, art. 13(a), (3) returning the child poses a "grave risk to his or her physical or psychological well-being or would place him or her in an intolerable situation," Hague Convention, art. 13(b), or (4) the return of the child would not be permitted by the fundamental principles of the requesting State relating to the protection of human rights and fundamental freedoms, Hague Convention, art. 20; see also Souratgar v. Fair, 720 F.3d 96, 102-03 (2d Cir. 2013) ("The district court is vested with considerable discretion under the Convention"). The first and second defenses must be established by a preponderance of the evidence, and the third and fourth defenses must be established by clear and convincing evidence. 22 U.S.C. § 9003(e). "[T]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and maturity at which it is appropriate to take account of its views." Hague Convention, art.

3

13; see also Souratgar, 720 F.3d at 102-03. This defense must be established by a preponderance of the evidence. 22 U.S.C. § 9003(e).

Finally, regardless of who prevails, "a decision under the Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Hague Convention, art. 19; see also Mota v. Castillo, 692 F.3d 108, 112 (2d Cir. 2012). "[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings," and it is not within the province of this Court to make determinations regarding which party is the better parent. Mota, 692 F.3d at 112. Rather, the Court should be concerned with effectuating the Convention's purpose of preserving "the status quo" and "deter[ring] parents from crossing international borders" seeking alternative custody arrangements, unless at least one of the five narrow defenses applies. Blondin v. Dubois, 189 F.3d 240, 246 (2d Cir. 1999).

## FINDINGS OF FACT

Based on the evidence presented at trial and having considered the parties' post-trial submissions, the Court makes the following findings of fact.

Mr. Porretti and Ms. Baez met in 2000 on a flight from San Juan, Puerto Rico to New York City. Tr. 54:14-15 (Oct. 7, 2019). At the time, Mr. Porretti, who is originally from Argentina, was working for a telecommunications company in Puerto Rico. Ms. Baez, who was working as a tax attorney in New York City, was visiting Puerto Rico. Id. at 53-55. Ms. Baez was born in Puerto Rico and lived there until she was approximately five years old. Id. The two began a long-distance relationship and in late 2001, after Mr. Porretti was relocated to Mexico for work, Ms. Baez moved there to live with him.[2] Id. at 56:1-8. Mr. Porretti and Ms. Baez

---

[2] Throughout the 14 years Ms. Baez lived in Mexico she returned to the United States, both alone and with her children, at least once a year for several weeks at a time. Tr. 60. While living in Mexico, Ms. Baez worked for

4

married in 2002 and had their first child, RP, in 2005. Id. at 52:17-18. In 2008, Mr. Porretti and Ms. Baez had a second child, who died shortly after birth. Id. at 58:13-24. At this time, Mr. Porretti joined a religious order called Legionaries of Christ and in carrying out the group's teachings, he told Ms. Baez not to mourn the loss of their child. Id. at 59:1-6. At this point, their relationship deteriorated "markedly." Id. at 58:13-14. In 2010, Ms. Baez gave birth to CP, and in January 2013, she filed for divorce in Mexico. The divorce action was assigned to Judge Sylvia Gomez. Id. at 53:5-6; 59:10-16.

After initiating divorce proceedings, Ms. Baez contemplated returning to New York with her children and traveled to New York alone on several occasions to reconnect with old colleagues and pursue potential employment opportunities. Id. at 59-60. On one such occasion, Ms. Baez traveled to New York from late February through early March 2013 and when she returned to the apartment she still shared with Mr. Porretti, the locks had been changed and she could not enter. Id. at 61:24-62:3. When Ms. Baez eventually entered the apartment, the children were gone and Mr. Porretti would not tell her where they were or when they would return. Id. at 66-67. Ms. Baez sat in the living room of the apartment insisting Mr. Porretti produce the children while Mr. Porretti yelled at her and called her derogatory names in front of a neighbor, an attorney and a work colleague, who had all assembled before Ms. Baez's arrival. Id. at 66-67. ("Mr. Porretti proceeded to yell and berate me for two hours, calling me stupid, an idiot, a whore, and a liar"). When the children's nanny finally brought them back to the apartment from a neighbor's house, the girls told Ms. Baez that their father said she had abandoned them and they thought they would never see her again. Id. at 67:6-17. For the next several days, Ms. Baez

---

approximately 13 months for an entertainment company. Id. at 57. Ms. Baez testified she left her employment because "Mr. Porretti asked [her] to because he believes that women should stay home with their children." Id. at 58:6-7.

stayed in the apartment with Mr. Porretti and her children, but had to enter the house through the back door, only accessible down a steep flight of stairs, because she did not have key access to the front door. Id. at 68.

Three days later Ms. Baez brought a locksmith to the apartment to regain access to the front door. Ms. Baez opened the door with her new key to Mr. Porretti, "screaming" and holding a torn copy of an official notice explaining he had violated court orders by changing the locks on the marital residence. Id. at 69:2-12. With both CP and RP present, Mr. Porretti physically assaulted Ms. Baez. Id. at 69. He pulled her hair, threw her to the floor and instructed the nanny to take her cell phone while he held her arms down. Id. at 69:14-21. Ms. Baez recalled her children screaming for her inside the apartment as Mr. Porretti physically pushed her out the door. Id. at 69-70. Ms. Baez testified that as she tried to reenter the apartment, she could hear the girls crying and calling for their mother. Id. at 69:22-70:1. Now phoneless, Ms. Baez went to a friend's apartment to contact her lawyer and the police. Id. at 70:5-10. After Ms. Baez filed a police report, a medical examination revealed bruising, consistent with an assault. Id. at 71:5-10; Resp. Ex. EEE.

Ms. Baez's attorneys dropped her off at a Howard Johnson's motel near the courthouse and filed court papers informing Judge Gomez of the incident. The parties were directed to appear before the court several days later. Mr. Porretti did not appear and went on to keep the children confined and isolated in the apartment for 26 consecutive days. Id. at 74; 77. The children were not taken to school and they had no contact with their mother. Id. at 77. During this 26-day period, Judge Gomez directed Mr. Porretti produce the children for an interview, which he failed to do. Id. at 77-78. Finally, Judge Gomez ordered a federal police raid of the apartment to retrieve the children. Id. at 79:5-8. When Mr. Porretti refused to voluntarily let the police in, they broke down the door. Id. at 81. Ms. Baez was present for the raid and witnessed

the police seize CP from Mr. Porretti while she was screaming. Id. at 81; 84:25-85:4 ("[Mr. Porretti] was being requested to hand over CP peaceably. He refused, clutching on to her to the point that she had to be pried out of his arms").[3] The children were taken to Judge Gomez's chambers. Judge Gomez signed the divorce decree and granted Ms. Baez primary custody and Mr. Porretti supervised visitation. Id. at 85-86:10. Within six months, Mr. Porretti was permitted unsupervised visitation, on the condition that he undergo psychological evaluations. Unsupervised visitation lasted for just over a year, until the Mexican court, once again, required supervised visitation only. Id. at 94-95. Throughout the custody proceedings, Mr. Porretti repeatedly disobeyed court orders, failed to appear for conferences and only appeared for a court-ordered psychological evaluation on penalty of arrest. In May 2016, the Mexican Assistant Attorney General for Focused Preliminary Investigations of the Central Investigatory Prosecutor for Offenses with Child and Adolescent Victims recommended indicting Mr. Porretti for domestic violence against RP, yet in September 2016, the Mexican appellate court reinstated unsupervised visitation. Id. at 116-17. When Ms. Baez informed the children that unsupervised visits would resume, both girls exhibited an "extremely negative reaction" and RP "threatened self-harm." Id. at 119-120. More than three years after Mr. Porretti was granted *ne exeat* rights,[4] and only after the Mexican appellate court reinstated unsupervised visitation conditioned on psychological evaluations—which Mr. Porretti historically avoided—Ms. Baez decided to expedite her efforts to relocate with her children to the United States. Id. at 120:1-8. ("I said, well, I'm a lawyer, but I'm first a mother. I have to take care of my children. If they're this

---

[3] See Resp. Ex. WW (affirming that the police arrived at the residence "hearing one of the minors crying," and that Mr. Porretti "at all times" "refused" to surrender the children and took "a very violent and aggressive stance" toward the police).

[4] A parent's *ne exeat* right is "the authority to consent before the other parent may take the child to another country." Abbott, 560 U.S. at 5.

afraid of him, I have to do what I need to do"). Notwithstanding the fact that Ms. Baez had primary custody of the children, the custody orders directed that neither parent unilaterally change the domicile of the children and that Mr. Porretti retain *ne exeat* rights. Id. at 17:3-5; 19:4-16.

In December 2016, Ms. Baez took her children from Mexico City to Tijuana and walked across the border to the United States. Id. at 121. From there, they flew to New York City, where they stayed with Ms. Baez's mother and sister in Brooklyn, New York. Id. at 125. Immediately after the Christmas holiday, CP started elementary school at PS-107, which she still attends today, and RP started middle school at MS-839. RP now attends Millennium High School in Brooklyn. A few weeks after arriving in New York, Ms. Baez and her children moved in with Ms. Baez's boyfriend, Mr. Messing.[5] Id. at 125. At the time, Mr. Messing lived in an apartment in Park Slope, Brooklyn. Ms. Baez began working as a document reviewer and eventually obtained employment with FINRA, where she was recently promoted to Associate Principal Examiner. Id. at 130. Within a year Ms. Baez and Mr. Messing purchased a new apartment in Windsor Terrace, just a short distance from Park Slope and across the street from Prospect Park. Id. at 126; 129.

Ms. Baez and her children have now resided in New York for almost three years. During this time, the children have spoken to Mr. Porretti twice—both within a month of arriving in the United States. Id. at 186-87. It is undisputed that CP and RP are thriving academically and socially. Both have many friends, participate in a host of different extracurricular activities and spend time with their mother's family in New York and New Jersey as well as Mr. Messing's

---

[5] During one of her visits to New York, Ms. Baez met Joseph Messing, a securities lawyer, in a Barnes & Noble bookstore. Id. at 194-95. The two struck up a relationship, which they maintained via phone and text message when Ms. Baez returned to Mexico to be with her children. Mr. Messing visited Ms. Baez over a series of long weekends. Eventually, Ms. Baez introduced Mr. Messing to her children.

family in Michigan, Washington D.C. and North Carolina. Id. at 148-49; 206. CP and RP speak English almost exclusively and prefer to respond in English when they are spoken to in Spanish. Id. at 164-65. Both children made clear *in camera* that they enjoy living in the United States in every respect—they feel a strong connection to their friends and family, they enjoy their schools and activities and do not wish to return to Mexico.

As part of this litigation, both children were interviewed and evaluated by Dr. Peter Favaro, a psychologist who specializes in high conflict divorce and custody proceedings in the United States. Ms. Baez retained Dr. Favaro to evaluate the children's adjustment to the United States, their possible interest in relocating to Mexico and to assess their level of maturity and the potential risk of psychological or physical harm if ordered to repatriate by the Court. Dr. Favaro testified that RP was mature for her age, "achievement oriented," "articulate" and capable of making an informed decision regarding repatriation. Tr. at 27-28 (Oct. 10, 2019). Though CP is younger, Dr. Favaro also testified that CP was mature for her age and capable of making an informed decision regarding repatriation. Id. at 28. Ultimately, based on his interviews with the children, Dr. Favaro testified that the children do not want to return to Mexico and, in his professional opinion, such a decision would be "catastrophic" for CP and RP psychologically, and would likely trigger significant stress. Id. at 20. He explained that the children are well-adjusted to life in New York and notwithstanding their obvious resilience and adaptability to changing circumstances, returning to Mexico at this time would cause incalculable "resentment and fear." Id. at 42.

## CONCLUSIONS OF LAW

I.   *Prima Facie* Case

Mr. Porretti has established his *prima facie* case by a preponderance of the evidence. It is undisputed that CP and RP were "habitually resident" in Mexico until ages six and eleven,

respectively, before being removed to the United States. Hague Convention, art. 3. Even though Ms. Baez had primary custody of the children, the custody order prohibited her from unilaterally changing the children's domicile. Accordingly, by removing the children to the United States without Mr. Porretti's consent or acquiescence, Ms. Baez made a unilateral decision to change the domicile of the children. Id.[6] Finally, it is undisputed that Mr. Porretti was exercising his visitation custody rights at the time the children were removed to the United States. Id.; Tr. 29:18-22 (Oct. 7, 2019); see also Souratgar v. Fair, 2012 WL 6700214, at *4 (S.D.N.Y. Dec. 26, 2012) ("A person cannot fail to exercise [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child" (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1066 (6th Cir. 1996)).

By bringing the children to the United States, Ms. Baez violated a Mexican court custody order and Mr. Porretti is entitled to pursue the remedies afforded by the Hague Convention and its implementing legislation under United States law, unless Ms. Baez can establish at least one of the Convention's affirmative defenses.

II.   Affirmative Defenses

a.   Well-Settled

Under Article 12 of the Hague Convention, a respondent who establishes by a preponderance of the evidence that a child is "so settled in [her] new environment that repatriation might not be in [her] best interest" may be entitled to the "well-settled" affirmative defense so long as more than a year has passed since the child's removal from her habitual

---

[6] Mr. Porretti also argues that Ms. Baez violated the Mexican custody orders because they directed the parents "ensure the constant consideration and closeness of the children with both of their parents, avoid…parental estrangement, and are bound to respect the right of their daughters to live with their parents [in Mexico] mutually." ECF No. 24, at 4. However, because Ms. Baez clearly violated the portion of the custody order prohibiting any parent from unilaterally changing the domicile of the children, the Court need not make a determination as to whether Ms. Baez violated other parts of the Mexican custody order as it relates to Mr. Porretti's *prima facie* case.

residence. Blondin v. Dubois, 238 F.3d 153, 164 (2d Cir. 2001); see also Demaj v. Sakaj, 2013

WL 1131418 (D. Conn. Mar. 18, 2013) (citing Public Notice 957, Text & Legal Analysis of

Hague Int'l Child Abduction Convention, 51 Fed. Reg. 10494, 10509 (Mar. 26, 1986)) ("nothing

less than substantial evidence of the child's significant connections to the new country is

intended to suffice to meet the respondent's burden of proof"). A child is "settled" if repatriation

would be "disruptive with likely harmful effects." In re D.T.J., 956 F. Supp. 2d 523, 534

(S.D.N.Y. 2013) (citing In re Lozano, 809 F. Supp. 2d 197, 230 (S.D.N.Y. 2011)). Whether a

child is "well settled" can, but need not necessarily, take into account factors including (1) the

child's age, (2) the stability of the child's new environment, including the child's residence,

schooling and community engagement, (3) whether the removing parent has stable employment

and (4) whether the child has family and developed friendships in the new environment. D.T.J.,

956 F. Supp. 2d at 534 (citing In re Koc, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001)).

 Ms. Baez, Mr. Messing and Dr. Favaro all testified that the children are settled, happy and

thriving in the United States. Members of the girls' community echoed that sentiment, which

was also convincingly confirmed by the girls in camera. Resp. Exs. LLLL-NNNN. Mr. Porretti,

on the other hand, argues that the well-settled defense cannot apply because, based on his

calculation of the children's "removal," his Petition was filed within one year. Even if the

defense applies, Mr. Porretti argues the Court should consider the children's interest in having a

relationship with their father and Ms. Baez's allegedly "outrageous conduct," including

alienating the children from their father and violating Mexican court orders. ECF No. 24, at 9;

see also, e.g., Tr. 48:14-16 (Oct. 7, 2019) ("[m]y daughters asked me not to call them because the

mother proceeded with violent actions and she would hang up the phone when I called").

 First, the Petition was filed more than a year after the children's removal from Mexico.

The children were removed in December 2016. Mr. Porretti learned of their removal in January

2017 but did not file the Petition until April 2019. Tr. 22:5-11 (Oct. 7, 2019). Mr. Porretti nevertheless argues that because he commenced this action less than one year after the August 2018 Mexican appellate decision affirming a custody order requiring the children remain in Mexico, they were "removed" in August 2018, in violation of that appellate decision. Pet'r Br., at 8. The fact that there was a Mexican appellate decision filed less than a year before April 2019 does not somehow change the date of the children's removal from Mexico—a static, immovable moment in time. Marks on behalf of SM v. Hochhauser, 876 F.3d 416, 421-22 (2d Cir. 2017) (removal or "retention [of a child] is a singular and not a continuing act" and explaining that "retention" relates to "an initial act of retention" not a "new state of affairs which will follow on such initial acts and which might also be described as retention"). Nor does it toll, in any sense, the one-year period under the Convention. Mr. Porretti was aware of the children's removal long before the most recent Mexican court order and his pursuit of Mexican court remedies—when he knew his children were not in Mexico—is of no avail in this proceeding. Mohacsi v. Rippa, 346 F. Supp. 3d 295, 326, n.16 (E.D.N.Y. 2018) ("Petitioner's delay in filing the petition in this Court even after he knew of [child's] location...counsels this Court against" ordering the child's return). Mr. Porretti knew the children were residing in the United States, implicating his rights and remedies under the Hague Convention, by January 2017. The Convention contemplates *prompt* repatriation because it recognizes the need to give children "certainty and finality." Ermini, 758 F.3d at 167 (citing Chafin, 568 U.S. at 185 (Ginsburg, J., concurring)). To indulge Mr. Porretti's three-year delay would undermine that important goal at no benefit to his children.

Second, both RP and CP are well-settled in the United States and repatriation to Mexico at this time would be "disruptive with likely harmful effects." D.T.J., 956 F. Supp. 2d at 534. The children have developed a cohesive network of friends and family in the United States. They are comfortable in every respect, performing well in school, engaged in the community and

involved in a host of extracurricular activities. The children's lives in the United States, save their involuntary participation in this litigation, are stable, if not enviable. They live in an apartment owned by their mother and her boyfriend of over five years across the street from Prospect Park. Ms. Baez, who is a citizen of the United States, is gainfully employed. The children have not changed schools since they moved to New York except by necessity—RP moved from middle school to high school. They have close friends and spend time with their mother's family and Mr. Messing's family. They travel and attend camp during the summer months. They participate in myriad extracurricular activities to their hearts' content. RP is able to focus on her school work without distraction.[7] CP takes care of her pet hamster. Both children speak perfect English with no trace of an accent, and often resist communicating in Spanish. They have a routine—Mr. Messing walks CP to school in the mornings, RP takes the subway. Tr. at 206 (Oct. 7, 2019) ("With CP, basically I take her to school every day and also to camp in the summer. It's kind of the highlight of my day"). CP participates in different afterschool activities Monday through Friday evenings, including karate, yoga, chess and basketball. RP typically returns home to complete her schoolwork—she hopes to attend Princeton University and is considering becoming an architect or lawyer. RP is also involved in audio-visual work at her school and plays the ukulele. On the weekends, the family spends time together relaxing or shepherding the children to social events and extracurricular activities. By all measures, the children are accustomed to a happy, normal and secure life in the United States—a life they have formed a lasting connection to over the last three years.

---

[7] The seriousness and dedication with which RP approaches her academic work was highlighted by her middle school assistant principal, Lauren Shookhoff. Ms. Shookhoff reported RP's "academic work shone, not just for accuracy, but for depth of thought, creative license and aesthetic beauty." Resp. Ex. NNNN. Though RP has since moved on to high school, "there are still teachers" at her middle school "who show [her] projects when they talk to their current students about quality criteria for complex, beautiful work." Id.

"Well-settled" "means more than having a comfortable material existence," Demaj, 2013 WL 1131418, at *14 (citing Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998)), as Respondent has certainly demonstrated. "The totality of the circumstances" reveals the "children's lives reflect stability in their family, educational, social and most importantly, home life." Demaj, 2013 WL 1131418, at *24 (citing Lozano, 809 F. Supp. 2d at 233). Indeed, this is not a case where "a child has moved frequently and therefore not had a stable living situation," "ha[s] far more family" in their habitual residence, "ha[s] a limited network of friends" in the United States or "d[oes] not engage in extracurricular or community activities," partially due to the parent's "financial and employment instability." Lozano, 809 F. Supp. 2d at 233. In every respect, the opposite is true for RP and CP and they have thus "reached the point at which [they have] become so settled in [their] new environment that repatriation is not in [their] best interest[s]." Id. (citing Blondin, 238 F.3d at 164); see also D.T.J., 956 F. Supp. 2d at 534; Mohacsi, 346 F. Supp. 3d at 323-24; Kosewski v. Michalowska, 2015 WL 5999389, at *22 (E.D.N.Y. Oct. 14, 2015); Taveras v. Morales, 22 F. Supp. 3d 219, 238-40 (S.D.N.Y. 2014); Matovski v. Matovski, 2007 WL 2600862, at *14 (S.D.N.Y. Aug. 31, 2007). Three years later, the children's "interest in settlement" overcomes the Petitioner's "right to adjudicate the custody dispute in the child's habitual residence." Taveras, 22 F. Supp. 3d at 240.

Third, though CP is only nine years old, a factor which might counsel in favor of repatriation because younger children are generally less able to form attachments and connections, D.T.J., 956 F. Supp. 2d at 534, this does not change the Court's determination that she is well-settled in the United States. Even if CP's younger age suggests that she might experience a less disruptive return to Mexico—a doubtful supposition—to separate CP from her older sister, particularly in light of the sisters' close relationship, would undoubtedly result in harmful effects to *both* children. Tr. 161 (Oct. 7, 2019). Furthermore, courts have found

14

children even younger than CP well-settled under similar or even less stable circumstances. E.g., Lozano, 809 F. Supp. 2d at 234 (well-settled five-year-old after sixteen months in the same location); Taveras, 22 F. Supp. 3d at 237 (well-settled eight-year-old after fifteen months in the United States); Kosewski, 2015 WL 5999389, at \*22 (well-settled seven-year-old after two years in the United States).

Finally, Petitioner's attempt to focus the Court on Ms. Baez's wrongful acts and her alleged alienation of the children from their father is unavailing. Petitioner has already established his *prima facie* case, but the Hague Convention clearly contemplates circumstances where, notwithstanding one parent's wrongful removal, repatriation may nevertheless be inappropriate. Though in some circumstances, "a variety of factors may outweigh the child's interest in remaining in the new country" even after a year since the removal, those factors do not hold weight here. Lozano v. Montoya Alvarez, 572 U.S. 1, 20 (2014) (Alito, J., concurring).

To that end, the Court has also considered (1) whether the children have any interest in returning to Mexico, including whatever remaining ties they have to Mexico, (2) the children's "need for contact" with their father, (3) Mr. Porretti's "interest in exercising the custody to which he…is legally entitled" and (4) "the need to discourage inequitable conduct" and "deter international abductions generally." Id. However, both children stated in no uncertain terms that they do not wish to return to Mexico. RP went so far as to state that she is not ready to reestablish a relationship with her father, whatever the location, and CP said she would be "surprised" to learn her father cared about her. Tr. 8-9; 23-24 (Oct. 10, 2019 Sealed). Neither child has substantial ties to Mexico. RP mentioned she stays in touch with one friend from Mexico who has since moved to Miami, and that she only recently reconnected with another former kindergarten classmate still residing in Mexico. Id. at 16.

Dr. Favaro testified to the children's "need for contact" with Mr. Porretti, agreeing that it is "good for a child" to have both parents in their life. Tr. 75:5-9 (Oct. 10, 2019). There is no reason why that cannot be the ultimate goal for RP and CP. But, it is clear that in this case, simply depositing the children back in Mexico would be incompatible with realizing that goal and could indeed jeopardize it. The children have been living in the United States for almost three years and although the Convention was designed in part to preserve the status quo by *promptly* returning child to their habitual residence, the well-settled defense exists precisely because after a certain amount of time the country to which the children were removed and where they have resided for an extended period of time becomes the new "status quo." <u>D.T.J.</u>, 956 F. Supp. 2d at 534. The children are, in the Court's estimation, remarkably mature, resilient and well-adjusted, but they are not robots that can be reprogrammed and returned to Mexico where they would, after three years, need to start all over again without a network of friends and family under inevitably stressful circumstances. At this point, to return to Mexico would not be a return to the status quo. It would be a new, and perhaps difficult, life. Respondent has therefore established the well-adjusted defense by a preponderance of the evidence and the Court finds the Petition must be denied on that basis.

b. Children's Wishes

Related to the well-settled defense, the Court may also deny Mr. Porretti's Petition if it finds that RP and CP "object[] to being returned and ha[ve] attained an age and maturity at which it is appropriate to take account of [their] views." Hague Convention, art. 13. The rationale for this defense is obvious: "[G]iven the fact that the Convention applies...to all children under the age of sixteen; it must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against [her] will." <u>Laguna v. Avila</u>, 2008

WL 1986253, at *9 (E.D.N.Y. May 7, 2008) (citing The Perez-Vera Report, the Explanatory Report to the Convention).

Both RP and CP stated to the Court *in camera* that they wish to remain in the United States and do not want to return to Mexico. RP expressed no interest in returning to Mexico and CP qualified that she might be amenable to visiting Mexico if it was "just for fun." Tr. 26 (Oct. 10, 2019 Sealed).[8] When the Court interviewed the children in chambers, outside the presence of the parties and their counsel, it was more than satisfied that each child spoke honestly. Both children were articulate and mature for their respective ages and the Court was impressed by their poise, breadth of interests and ambition. Both children eagerly and readily identified academic and extracurricular interests and described their extensive familial and friendship network in the United States. RP went so far as to identify specific educational opportunities she hopes to achieve—such as attending Princeton University—that are only available in the United States. Cf. Laguna, 2008 WL 1986253, at *11 (petition denied where "child's objection to returning...is the product of independent reasoning and thoughtful consideration").

Given the circumstances, the Court was not surprised by the children's reactions to the thought of returning to Mexico. However, what was even more telling was the spontaneity, strength and forcefulness of their reactions. Without a moment's hesitation or equivocation, RP and CP told the Court that they do not want to return to Mexico. RP's reaction was followed immediately by tears and CP visibly withdrew in her chair and spoke in fearful, but nevertheless confident, tones. RP readily distinguished for the Court why it "wasn't that hard" to leave Mexico in 2016 because she was "ready to come [to the United States] and start a new life," but

---

[8] RP recalled that even when she still lived in Mexico, she wanted to leave and was happy to move to the United States. RP associates Mexico with her parents' divorce and the unfortunate collateral effects of that divorce, so when it came time to move, she was ready "to get away from that life and start a new one." Tr. 16:8-9 (Oct. 10, 2019 Sealed).

that she would very much resist going back to Mexico now. Tr. 6:22-24 (Oct. 10, 2019 Sealed) (THE COURT: Obviously, the thought is that perhaps some day you'd move to Mexico. RP: No. No.). Moreover, RP and CP's testimony is corroborated by testimony from their mother, Mr. Messing and the declarations submitted by non-family members who play active roles in the children's lives. On the other hand, the children have no family in Mexico except their father. Neither their mother nor father are Mexican natives. Neither child has maintained significant contact with friends in Mexico and neither identified particular academic or extracurricular pursuits they would prefer in Mexico. In re D.A., 2015 WL 2344079, at *5 (E.D.N.Y. May 14, 2015), aff'd Adamis v. Lampropoulou, 659 F. App'x 11 (2d Cir. 2016).

The Court is not oblivious to the fact that when a child testifies there is "always an issue…as to whether the testimony has been unduly influenced by [her] parents," and specifically "the preferences of the parent with whom…she lives." Laguna, 2008 WL 1986253, at *10. Nevertheless, this risk does not suggest the Court must turn its back on a child's sincere and thoughtful wishes. This is not a situation where the Court has any doubt that the opinions expressed by CP and RP were their own and not "the product of the influence of the Respondent." Lieberman v. Tabachnik, 625 F. Supp. 2d 1109, 1127 (D. Colo. 2008). Instead, the children's objections to returning to Mexico are "substantially based on their understanding and appreciation of their significant contacts to New York and the lack of such connection to [Mexico]." Johnson v. Johnson, 2011 WL 569876, at *6 (S.D.N.Y. Feb. 10, 2011) (citing Matovski, 2007 WL 2600862, at *15).

Finally, like the well-settled defense, even if CP's younger age is an indication that she might not have the requisite age and maturity to sincerely express her wishes, the Court both finds that (1) CP is more mature than the average nine-year-old and was able to cogently explain her preference for visiting Mexico "just for fun" as opposed to relocating to Mexico to live with

her father, and (2) in any event, separating CP and RP simply because CP is younger and perhaps less capable of making a mature decision regarding her living situation, would be manifestly misguided. Accordingly, the Court finds that Respondent has established by a preponderance of the evidence that the "children's wishes" defense applies and warrants denial of Mr. Porretti's Petition.

      c.  Grave Risk of Harm

Lastly, the Court may deny Mr. Porretti's Petition if it finds by clear and convincing evidence that returning the children to Mexico would expose them to a "grave risk" of "physical or psychological harm or otherwise place the child in an intolerable situation," even after taking into account "ameliorative measures" in the child's habitual residence that "can reduce whatever risk might otherwise be associated with a child's repatriation." Blondin, 189 F.3d at 248. However, under certain circumstances, ameliorative measures may be insufficient, if not futile, because the child's "mere presence" in their habitual residence—"the site of their trauma"—creates a "grave risk" the child will suffer psychological harm. Blondin, 238 F.3d at 161.

The "grave risk of harm" defense presents a formidable burden for any Respondent, and the Court acknowledges that from a bird's eye view, it may seem as though Respondent falls short in this case. Indeed, a "mere showing[] of inconvenience or hardship do[es] not amount to a grave risk of harm." Kosewski, 2015 WL 5999389, at *16. Instead, the child must "face[] a real risk of being hurt physically or psychologically as a result of repatriation." Id. Even undisputed evidence of some risk of harm from repatriation "will not satisfy the grave risk exception if the risk of harm proven lacks gravity." Id. To that end, there must be "evidence of a sustained pattern of physical abuse…or a propensity for violent abuse. Evidence of sporadic or isolated incidents of abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the grave risk exception." Id.

(finding that "spanking," "throwing objects near the child," and "arguing loudly" with the mother in the presence of child were not enough to satisfy grave risk defense); <u>Laguna</u>, 2008 WL 1986253, at *8-9 (evidence that father used to drink excessively but did not necessarily have a current drinking problem, coupled with evidence of only one incident that "involved any sort of danger" where the father "packed all of [child's] belongings and threw them outside" was insufficient to satisfy grave risk defense). Ultimately, the Respondent must proffer evidence of a "*sustained* pattern" of physical or psychological abuse. <u>Laguna</u>, 2008 WL 1986253, at *8-9 (emphasis added).

Though Respondent's "grave risk of harm" evidence is confined to a specific period of time, the Court's analysis cannot stop there. Mr. Porretti physically assaulted Ms. Baez in front of both children and then proceeded to hold his children hostage for 26 days. During that period, the children did not attend school. They were not produced to Judge Gomez pursuant to court order. They did not see their mother.[9] Even if this 26-day period technically constitutes a "single" incident of abuse, its prolonged and unrelenting nature is more akin to a "sustained pattern of abuse" which has undoubtedly had a lasting and profound effect, particularly for RP. The gravity and persistence of this 26-day incident, coupled with Mr. Porretti's pattern of refusing to comply with court orders, persuades the Court that risk of harm in this case is more like the risk of harm that justified denial of the father's petition in <u>Blondin</u>. In <u>Blondin</u>, the Court agreed that even if the children repatriated to France and "could avoid being in the same domicile as their father,"—their abuser—"they would almost certainly suffer a recurrence of their traumatic stress disorder" that "would set them back in a very harmful way...undo[ing] the benefit of the psychological and emotional roots they have established" in the United States.

---

[9] When interviewed by Judge Gomez in Mexico, RP confirmed that she and CP "did not communicate with [their] mother for twenty seven days," and explained that her "father stole the passports." Pet'r Ex. 4.

<u>Blondin</u>, 238 F.3d at 160. Even with ameliorative measures in place by French authorities, the Court concluded that the children would "face an almost certain recurrence of traumatic stress disorder on returning to France because they associate France with their father's abuse and the trauma they suffered as a result," and "a "grave risk of psychological harm even construed narrowly, undoubtedly encompasses an almost certain recurrence of traumatic stress disorder." <u>Blondin</u>, 238 F.3d at 161-63.

Here too, Dr. Favaro—whose testimony was measured and understated—testified that returning the children to Mexico would be a "catastrophic adjustment" and would subject them to a grave risk of psychological harm. Tr. 20. He elaborated that, evaluating the children in terms of a "continuum" of stress, the children would experience the highest level of stress—a catastrophic level—if they were returned to Mexico. Tr. 21. He opined that the children would not be able to repatriate "without the baggage of catastrophic stress and unhappiness and just poor quality of life, psychologically." Tr. 31. Indeed, *in camera*, the mere mention of returning to Mexico and reestablishing a relationship with her father elicited tears and an immediate string of "nos" from RP, which only reinforces Dr. Favaro's conclusions. Tr. 8 (THE COURT: I see I've upset you already, and the last thing...in the world I wanted to do was upset you). Just the thought of returning to Mexico reignited visible, palpable stress for RP, leaving the Court even more convinced that to actually order her return would result in the levels of stress Dr. Favaro projected.[10]

---

[10] It is also worth noting that when Mr. Porretti finally submitted to a court-directed psychological evaluation under penalty of arrest, the psychologist observed that Mr. Porretti "shows himself with little empathy to the needs of the individuals around him," has "little tolerance to frustration, which determines his reaction...when things do not come out as he wants," "shows feelings of anger and stress" and "does not acknowledge his own responsibility, and, on the contrary, he completely blames his wife." Pet'r. Ex. 4. Ms. Baez, who willingly submitted to a court-directed psychological evaluation "show[ed] features of a conventional, hedonistic, responsible person with self-pity, realistic, expressive, and focused on herself among other things," but is "defensive and distrustful...in interpersonal relations," exhibits "anger, fear, resentment" with respect to Mr. Porretti and "make[s] him completely responsible for the problems between them." <u>Id</u>. As a mother, the psychologist concluded she is a "guiding and loving figure"

Though whether a child is "well-settled" can factor into the Court's grave risk of harm analysis, Blondin, 238 F.3d at 157-58, it is clear from RP's testimony that even before she came to the United States, remaining in Mexico after experiencing her father's psychological abuse and 26-day period of confinement was stress inducing and psychologically damaging. And, now that RP is in fact well-settled in the United States, the stress and psychological impact of returning to Mexico would only be multiplied. Id. at 165 (finding consideration of whether children "were settled in their new environment as one factor in [the] grave risk analysis" is appropriate and declining to disturb the district court's finding that "wrenching the children away from the safe, extended-family environment in which they have begun to recover from the trauma caused by their father's abuse would thwart their recovery by causing a recurrence of the traumatic stress disorder they suffered...[at] the site of their father's sustained, violent abuse").

Accordingly, Respondent has established by clear and convincing evidence that the children face a grave risk of harm if they are returned to Mexico. The stress occasioned by the thought of returning to Mexico cannot be understated. It is that traumatic, catastrophic stress and Mr. Porretti's demonstrated ability to take drastic, sustained and psychologically harmful action with respect to his children while ignoring court orders that persuades this Court that returning the children to Mexico poses a grave risk of psychological harm that cannot be ameliorated by Mexican court intervention.

## CONCLUSION

Mr. Porretti has established his *prima facie* case that his children were abducted in violation of the Hague Convention, but the Court finds that Ms. Baez has successfully established

---

and "her interaction with her girls is in functional terms." Id. The plain fact that both parents hold the other entirely responsible for the dissolution of their marriage only exacerbates the already certain trauma and stress the girls will experience if they are returned, adding to the Court's disinclination to grant the Petition.

all three of her affirmative defenses. The children are well-settled in New York, they have

sincerely, thoughtfully and credibly expressed their desire to remain in New York and returning

to Mexico would create a grave risk of retriggering the traumatic stress that pervaded their last

few years in Mexico.

Regrettably, long-standing and emotionally-fired discord continues to divide the parties.

Although the record before this Court unquestionably demands a denial of this tardy Petition in

the best interests of two innocent young ladies, in the end, no Court, wherever situated, has the

power to provide the very best alternative for the girls. That higher purpose is not found in the

law. It is instead entrusted to the hearts of loving and selfless parents. In that spirit, the Court

wishes them all well.

The Petition is denied.

SO ORDERED.

Dated: Brooklyn, New York
      October 29, 2019

                                        s/ Raymond J. Dearie
                                        _____
                                        RAYMOND J. DEARIE
                                        United States District Judge